Hakbison, J.,
delivered tbe opinion of the Court.
The proof in this cause shows the following state of facts: Lundy made the note sued on in this action, on the 17th February, 1862, payable six months after date, to the order of Bynum, the defendant in error, payable at the Branch of the Union Bank of Tennessee, at Memphis, and Bynum indorsed the note, the word Memphis appearing just below his name in the indorsement. Whether the word Memphis, there appearing, was written by Bynum, is not shown. The plaintiff in error, E. M. Apperson, is the surviving partner of E. M. Ap-person & Co., and became the holder of the note. On the 17th of February, 1862, when the note was made and indorsed, the maker, indorser and holder all resided within the lines and district of country of the Confederates, who occupied the country in and around the City of Memphis; the plaintiff residing in Memphis; the maker, Lundy, some ten or twelve miles south of Memphis; and Bynum in Mississippi, several miles south of Lundy’s, and south of Nonconnah Creek. The Branch of the Union Bank, at Memphis, where the note was payable, under the orders of the rebel General, Beauregard, moved its assets south, on the 28th of May, 1862, but the office was kept open by F. W. Smith, the Cashier, to answer the questions of any persons in the com *346 munity who had any interest in the affairs of the Bank, to receive special deposits at the risk of the depositor, and partly, also, to prevent the occupation and confiscation of the property by the United States. From the 28th of May, 1862, until February, 1864, no general business was transacted, and its assets were not- returned until June, 1865. The military forces of the United States took possession of, and permanently occupied Memphis, on the 6th to the 10th of June, 1862, The United States picket lines extended around the city some two miles, and never extended beyond Nonconnah Creek, which creek was between Lundy’s house and Memphis. Their lines of permanent occupation never extended beyond from two to four miles from the city. The country south of that, was now and then occupied by the forces of each belligerent. Several witnesses examined, testified that in August and September, 1862, persons freely passed from Memphis to the neighborhood of Lundy and Bynum without difficulty, and came back in the same manner; but that the Federal picket lines surrounded Memphis.
Lundy, as it is shown, was also in the City of Memphis in the summer and fall of 1862. The witness, Ford, had, during that time, frequently gone out to the neighborhood, of Lundy and Bynum without a pass, and states that the pass system was not adopted until af-terwards.
The proof further shows that the attorney of the holder of the note handed the original note to the witness, J. P. Young, to make a demand of the maker for payment, and a notice of demand and refusal of pay *347 ment to be served on or delivered to defendant as in-dorser of the note; which notice is dated the 26th of May, 1865, and the certificate or statement of the delivery thereof is in the words following:
“May 29th, 1865.
“On this day, I, at the request of E. M. Apperson, surviving partner of E. M. Apperson & Co., presented the note for $15,221.09, (of which the subjoined is a true copy,) to Wm. L. Lundy in person, and demanded payment of said note from him, which was refused; whereupon, on same day I proceeded to the house of B. C. D. Bynum, and delivered to him a written notice of said demand and refusal of payment in the usual form.
“J. P. Young.”
The notice, (Exhibit B,) to Young’s deposition dated as above, stated on the 26th May, 1865, was delivered to Bynum on the 29th May, 1865, which occurred as stated by the witness, Young, by the counsel of plaintiff having made out the notice three days before Young served it on defendant.
The questions raised by counsel have been very elaborately argued, and with earnestness and ability have been pressed upon our consideration; and the authorities cited upon these questions are numerous. We will proceed to dispose of such of the questions made, as we consider necessary to notice. The rule is, that, in order to charge the indorser, the demand should have been made on the day of the maturity of the note. But, although this is the general rule, it is not an universal one, and prevails only under the qualification, which is a part of the rule itself, that there is no neg *348 ligence or want of diligence in not making such presentment. To excuse the demand and notice as required, the rule, we think, is, as we have laid it down at this term, in the ease of Polk vs. Spinks. If the demand is made after the day of the maturity of the note, it is insufficient for the purpose of charging the indorser, except when it is made under circumstances which the law recognizes as a valid excuse for a delay in making the demand. As to the place where demand of payment of a note should be made, there is a difference in the principles of law applicable to the question, in case of a note payable generally, and one in which a place of payment is specified. In the former case, where the maker has a place of residence, but none for the transaction of business, the demand can be, and should be, made at his place of residence; and where the note is payable generally, the parties may agree upon the place where it shall be presented, and a presentment at the place appointed is sufficient to charge the indorser. But, in the latter case, that is, where the place of payment is specified in the note, it seems to be settled, that, in order to charge the indorser of the note, a demand at the place designated, is necessary: 1 Parsons on N. & B., 431; and 11 Wheaton, 177, case of Bank of U. S. vs. Smith; and is a condition precedent to an indorser’s liability: 1 Ala., 375; 3 Camp, 247; 9 Wheaton, 558; 11 Wheaton, 171; 1 Stewart, 234. If, however, the holder, on the day of payment, finds the place of payment closed, we think it would excuse him from making any further demand, to charge the indorser; and if the office at which the payment was to have *349 been made, has ceased to exist previous to, or at, the maturity of the note, it has been held that no demand at all was necessary: See Ala. Rep., 1 vol., new series, 376; and this seems to be the doctrine laid down in 3 Kent, citing 3 Johns. Cases, 71; 3 Johns. R., 202-8.
Whether this ruling, that in the case mentioned, no demand at all is necessary, is correct, we need not en-quire, so far as a demand of the maker is concerned; for in the case we are considering, a demand was made of the maker, but not at the place where the note was payable. Was the plaintiff in error excused from making a demand at the place where the note was payable? We are aware . that it is clearly settled, that, as against the indorser, where the note is payable at a certain place, it must be there presented; but where, as in the case of Roberts vs. Mason, 1 Ala., the Bank where the note was payable had ceased to exist previous to the maturity of the note, a demand at such place would have availed nothing. The contract in such a case did not impose on the holder such a duty, nor would there be any just ground on the part of the holder to expect that the payment of the note would there be met. The note made by Lundy, indorsed by Bynum, did not impose upon the indorsee, or holder, the necessity of making a personal demand of the maker, but only a presentment on maturity at the place on its face. This being impracticable, no such demand was necessary. This condition, on which the liability of the indorser depended, became impossible, if the place at which the note became payable had ceased to exist, and this occurrence was not produced *350 by the instrumentality of the holder; and it cannot be held to interpolate the contract of indorsement, so as to make the indorser’s liability depend upon the performance of the condition by the indorsee, which did not constitute a part of the original contract: 1 Ala. 378. The Branch of the Union Bank, at Memphis, had ceased to do any general business. Its assets had been carried South before the day on which the note matured. The proof informs us, that the Cashier remained at the banking house for certain specific purposes, but certainly, not for the purpose of keeping the institution, as such, in operation. There were none of the officers there, save the Cashier. The very fact of removing its assets, shows a suspension of its business. In fact, we are left fairly to infer, that, as a branch of the Union Bank, it had ceased to exist; and the removal of the assets, coupled with the fact that „ it did no general business, and that a state of war existed, was certainly sufficient to take away all expectation on the part of the holder that the note would be met at that place, and to make the presentation at the banking house a useless formulary.
The proof in the cause, the events of which this Court will take judicial cognizance, and the adjudication of the questions raised in “The Venice,” in the Supreme Court, reported in 2 Wallace, 277, and the prize cases in '2 Black.; in the former of which cases, the Act of Congress, of 13th July, 1861, and the proclamation of the President, of August 16, 1861, passed under the examination of that Court, leave us very little difficulty in deciding the question which has *351 been so ably discussed in this cause, as to tbe relation which the holder, maker, and indorser of the note sued on, sustained to each other after the permanent occupation of the City of Memphis by the national troops, and before the maturity of the note. The decisions of the Supreme Court of the United States, are entitled to the weightiest consideration, as authority, at all times and upon all questions, but more especially, upon the class of questions adjudicated in the cases referred to.
After the City of Memphis was captured by the national forces, the holder, Apperson, remaining in Memphis, a place which, from the time of its capture, was occupied and controlled by the forces of the United States, engaged in the dispersion of the insurgents, that is to say, occupation and control that was actual, substantial, complete and permanent, sustained towards Lundy, and Bynum, the relation of an enemy. As was held in the Venice, “the Legislative and Executive action, (viz: the Act of July, and the proclamation of August, 1861,) related mainly to trade and intercourse between the inhabitants of loyal and ' insurgent parts of the countryand hy excepting districts occupied and controlled by national troops from the general prohibitions of trade, it indicated the policy of the government not to regard such districts as in actual insurrection, or their .inhabitants as subject, in most respects, to treatment as enemies.” Such substantial actual occupation drew after it the full measure of protection to persons and property consistent with a necessary subjection to military government, and replaced rebel by na *352 tional authority, and re-organized, to some extent, the conditions and responsibilities of national citizenship.
But Lundy and Bynum, and persons not within the City of Memphis, and the district of country around Memphis, so occupied and held by the national troops, were in relation of enemies to Apperson; and if even the public or general laws of war did not have the effect, the Act of Congress, of July 13, 1861, made all commercial intercourse and transactions between them unlawful, until at least the section in which the former resided should also be so actually and permanently held and controlled by the National Government. Apperson could not present the note to Lundy for payment at his residence, ten or twelve miles South of Memphis; for Lundy was beyond the line of pickets, indicating the extent of the occupation' of the place or section around Memphis, held by the' national troops; and if he could reach him at his residence, on the day the pote matured, it would, owing to the relation between them, the existence of war, and the Act of Congress, be unlawful. He could not be required to present the note for payment at the Branch of the Union Bank, at Memphis, at maturity, for the reasons stated.
It is insisted, however, that, admitting that this condition of things, and the relation between the parties existed, yet, that it continued until after the demand was made on the 29th May, 1865, to-wit: until the President declared, by proclamation, that the States and sections or districts mentioned in his former proclamation, as being in insurrection, were no longer in *353 that condition; and that if it was unlawful for the plaintiff in error to make the demand in 1862, it was equally so to make it on the 29th May, 1865; because the President’s “ peace proclamation” had not then been issued. We cannot assent to the corre ct ness of this reasoning.
The Act of Congress, of July 13, 1861, made it lawful for the President, by proclamation, to declare the whereabouts of any State, or section of it, where insurrection existed, in a State of insurrection against the United States, “and thereupon,” (the statute proceeds,) “all commercial intercourse, by and between the same and the citizens thereof and the citizens of the United States, shall cease and be unlawful, so long as such condition of hostility shall continue,” etc. This is the express provision of the Act of Congress from which the President derived his power to make the proclamation therein provided for. The proclamation of 16th August, 1865, was promulgated in pursuance of the Act of Congress, and excepted from the interdiction of commerce, the inhabitants of such States “p,s may maintain a loyal adhesion tq the Union and Constitution, or may be, from time to time, occupied and controlled by forces of the United States, engaged in the dispersion of the said insurgents.” It is true, that, in a subsequent proclamation, reciting that experience had shown that the exceptions made as above, embarrassed the execution of the Act of July 13, 1861, they were revoked; and the inhabitants of the several States mentioned in this proclamation, except, etc., were declared in a state of insurrection; and all commercial *354 intercourse not licensed, etc., declared unlawful, “until sucb insurrection shall cease, or be suppressed, and notice thereof has been duly given by proclamation.”
But it is sufficient, we think, to say that the holder of the note in this cause, was bound to make demand of the maker for its payment, and give notice to the in-dorser, within a reasonable time after the impediments, the existence of which excused him from so doing, were removed; and that we must look to the question of when, in point of fact, those impediments were removed, and not alone to the time when the President thereafter declared that rebellion, insurrection, and war, no longer existed; especially as by the Act of Congress authorizing the proclamation of the 13th July, 1861, it was contemplated and declared that commercial intercourse therein authorized to be interdicted, was, after the proclamation therein provided for, to cease and be unlawful, so long as a condition of hostility existed.
Another question made by the defendant in error, is, whether Apperson used due deligence in giving notice to Bynum, after the demand of payment. The proof shows, that he, in point of fact, gave notice to the indorser, on the day of the demand. Under the peculiar ^circumstances of the case, however, as the cause will be remanded for a new trial, we have deemed it best to express no opinion as to whether the notice given on the 29th August, 1865, being dated the 26th, was sufficient. It is probable the jury was misled by the charge of the Court. We do not attach much weight to the affidavits of the jurors, *355 used on a motion for a new trial; but it is most likely they were misled, as the charge, particularly on the subject of giving notice through the post-office at Memphis, was calculated to mislead. See pages 41 and 42 of transcript. The charge is erroneous, because the Judge in the Court below, left the jury to proceed upon the idea that if the defendant had free access to Memphis, and the Memphis post-office, after the maturity of the note, and could go in and out of Memphis at will, and that notice might have been given him through the Memphis post-office, then that it was the duty of plaintiff in error to give defendant in error the notice through the post-office; and this too, as we think, the jury may have inferred, notwithstanding the enemy relation between the holder, and maker, and indorser, and the Act of Congress, and proclamation referred to.
Let the judgment be reversed, and the cause remanded for a new trial.